## STATE OF CONNECTICUT *v.* JOHN VIVO III
## (SC 15397)

Callahan, C. J., and Norcott, Katz, Palmer and McDonald, Js.

Argued April 24—officially released July 15, 1997

*Dante R. Gallucci*, for the appellant (defendant).

*Richard F. Jacobson*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *C. Robert Satti, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, John Vivo III, appeals from the judgment of conviction, after a jury trial, of murder in violation of General Statutes § 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1) and commission of a class A and B felony with a firearm in violation of General Statutes § 53-202k.[1] The trial court sentenced the defendant to

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

a total effective sentence of seventy-five years imprisonment. The defendant's appeal was transferred to this court from the Appellate Court pursuant to General Statutes § 51-199 (b) (3) and Practice Book § 4027. The sole issue in this appeal is whether the trial court properly denied the defendant's motion to suppress evidence. We affirm the judgment of the trial court.

The state presented the following evidence. On February 23, 1994, at approximately 7:15 p.m., Yolanda Martinez and William Terron were crossing a courtyard at the Evergreen Apartments in Bridgeport when the defendant and two other persons, armed with semiautomatic weapons, ran up to them. Martinez identified the two others as Joel Rodriguez and Eric Floyd. The defendant pulled Terron near a fence where he shot Terron ten times, killing him. At the same time, Rodriguez shot Martinez in the hand and in the upper right arm, before he and Floyd ran to a nearby car. The defendant then ran over to where Martinez lay on the ground and shot her in the legs three times. The defendant thereafter joined the others, and they fled in a car.

At trial, the state introduced into evidence, among other exhibits, nineteen nine millimeter cartridges. The cartridges had been seized from the defendant's apartment in the Green Homes Apartments in Bridgeport pursuant to a search warrant.[2] The defendant unsuccessfully moved to suppress all items seized from his apartment under the fourth amendment to the federal constitution, made applicable to the states through the fourteenth amendment.[3]

In an oral decision denying the defendant's motion, the trial court found the following facts. "[O]n that

[2] The defendant claims that a ski mask that was also discovered during the warranted search was introduced into evidence. A ski mask was seized by police and introduced in the defendant's first trial, which ended in a mistrial, but the ski mask was not introduced in the defendant's second trial at which he was convicted.

[3] The defendant does not make a state constitutional claim.

evening, February 23, 1994, information had developed that [the defendant] had been involved in the homicide that we are dealing with here, where it was known to the police that there were one or two other persons also involved with him, [who] were described as armed and dangerous, [and] one of whom . . . apparently, or they had information, had been involved in other homicides.

"At that time the police did not know the whereabouts of any of the suspects. They happened to obviously have information that the defendant['s] father was a member of the Bridgeport police department, and a member of that department went to his home that evening. And the father was in fact off duty and in bed. But he came to headquarters at the request of his superiors and they advised [the father] that they had information that [the defendant] was possibly involved in a homicide and they were looking to find him and/or to question him, and asked the father's assistance in locating him.

"The father indicated that he thought that the defendant might be at the Green [Homes] apartments where apparently [the defendant's mother] had once lived. [The father], along with a number of other police officers, went to that apartment . . . . The father knocked on the door, [and] asked the [defendant] if they could come in. And apparently the [defendant] opened the door and allowed them in. The father came in with other police officers.

"[The defendant] was immediately cuffed. There is some question as to when exactly he was arrested. Sergeant [Joseph] Sherbo indicated that he immediately told [the defendant] that he was under arrest, possibly not specifically for . . . any particular crime, but he testified he did tell the defendant he was under arrest.

The father testified he didn't hear those words, but there is no question that the [defendant] was in fact cuffed.

"The [defendant] remained in the apartment for about two minutes, two to three minutes after they arrived. Other officers fanned out throughout the apartment, basically was the testimony, to see whether or not any of the other persons involved might have been within the apartment. They were doing that obviously for their own protection, number one, and also to apprehend anybody else who might be there.

"There is no question that officers went into the various rooms in the apartment, including the defendant's father who actually went into a closet . . . in the defendant's bedroom. All of them were told . . . at the beginning don't touch anything because they were going to seek a search warrant to go back into the apartment later on.

"There is some question as to whether or not there may have been some improper searches by certain officers at the time. The only testimony the court heard was the testimony of the father, who indicated that he himself found the bulletproof vest in a closet, [but] was told by a supervising officer to put it back because they were going to get a warrant to search the apartment later on. He said he overheard conversations about officers possibly finding a bag or plastic bag where some bullets were contained, although he said he didn't actually see it. He also testified that after the [defendant] was removed he observed other officers looking into drawers in the kitchen area of the [apartment].

"The court [concludes], on the basis of the evidence, although Sherbo didn't see any of this, that probably some type of an improper search of drawers within the bedroom and/or kitchen took place, where it appears that other bullets and/or a [ski] mask were found. As I have already indicated, the father is the one that went

in the closet which I think he had a right to go into to make sure nobody was in there, found the bulletproof vest and was immediately told to put it back."

The trial court concluded that the police lawfully entered the defendant's apartment[4] and that they searched the apartment for other suspects in order to ensure their own protection. The court found that "[i]t was clear from the very beginning . . . that once they had found [the defendant] in that apartment . . . they were going to go back and seek a warrant and search that apartment." The court, therefore, based its denial of the defendant's motion to suppress "on the fact that the police did eventually seek a warrant. There is no claim that that warrant was not a proper search warrant. . . . It is clear in reviewing that warrant that there is nothing in the warrant affidavit mentioning any of the items that might have been viewed by the police prior to their getting the warrant. There is nothing in there about a vest. Nothing in there about bullets, and nothing in there about a mask. So the probable cause to search that apartment was based on other materials contained within that search warrant affidavit. . . . That leads the court to the conclusion that this search was going to take place. The police had always planned to undertake it. They did not require anything that they found in the apartment prior to getting the warrant to establish probable cause. And under the exception to the fourth amendment of inevitable discovery the court rules that the search was proper . . . ."

It is undisputed that the police left the apartment to obtain a search warrant for the premises and that an officer was posted outside the door of the apartment to secure the premises. Sherbo and another detective prepared a search warrant affidavit containing the fol-

---

[4] The trial court noted that the defendant had not claimed that the police entry was unlawful.

lowing information. On February 23, 1994, at approximately 7:40 p.m., police responded to a report of gunshots at the Evergreen Apartments. There, they found Terron, who had suffered multiple gunshot wounds to the head, chest and back and was pronounced dead at the scene. The police also found Martinez, who had suffered multiple gunshot wounds to the lower part of her body. Martinez told Detective Donald Jacques that she and Terron had been shot by the defendant, that the defendant had an Uzi type weapon and that two other persons had been involved in the shootings. Other witnesses had heard rapid-fire gun shots during this episode. The police also found numerous nine millimeter bullet fragments at the scene. After interviews with several citizens, the police learned that the defendant might be living at the Green Homes Apartments. The police then went to the Green Homes Apartments, where, at apartment 423 in building four, they found and arrested the defendant. The affidavit concluded by stating that apartment 423 was being secured while the police sought a search warrant.

The defendant contests neither the legality of his arrest nor the sufficiency of the probable cause supporting the search warrant. The defendant argues, however, that the taint of the initial, illegal search cannot be purged by the subsequent search warrant and that, therefore, the items seized pursuant to the search warrant must be suppressed. The defendant contends that, without a search warrant, the police, while arresting him, were entitled to search only those areas of the apartment where an individual with a weapon could be posing a threat; see *Maryland* v. *Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990); and that the police search of his apartment at the time of his arrest led to the illegal discovery of the nineteen nine millimeter cartridges that were introduced into evidence. Under

the exclusionary rule, the defendant argues, the cartridges should have been suppressed.

We agree with the trial court that even if the police did conduct an impermissible search of the apartment when they arrested the defendant, the evidence that was later seized pursuant to the search warrant need not be suppressed. We do so because that seizure was not the fruit of any illegal search that may have occurred. In *Wong Sun* v. *United States*, 371 U.S. 471, 487–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), the United States Supreme Court held: "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light *but for the illegal actions* of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Emphasis added.)

The independent source doctrine and the inevitable discovery doctrine are recognized exceptions to the exclusionary rule and are "closely related." *Nix* v. *Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). Those doctrines are based on the premise that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." (Emphasis added.) Id. The independent source doctrine and the inevitable discovery doctrine, however, have distinct applications in relation to the exclusionary rule.

Independent source, in the exclusionary rule context, means that the tainted evidence was obtained, "in fact," by a search untainted by illegal police activity. *Murray*

v. *United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). Inevitable discovery in that same context means that the evidence was illegally obtained, but would have been discovered legally had the legal means to do so not been aborted because of the illegal seizure.[5] Id.

While the trial court alluded to the inevitable discovery doctrine, its analysis and findings indicate that it held the search to be proper pursuant to the independent source doctrine. In the case of a search conducted pursuant to a search warrant, "[t]he two elements that must be satisfied to allow admission [under the independent source doctrine] are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States* v. *Johnson*, 994 F.2d 980, 987 (2d Cir. 1993); *Murray* v. *United States*, supra, 487 U.S. 542. The defendant here does not contest that the warrant was supported by probable cause derived from sources independent of the illegal search. In fact, the defendant argues that the items observed by police during the initial search were "carefully not listed" on the warrant affidavit. The defendant argues, however, that "[b]ased upon the testimony at the suppression hearing, it would strain credulity to believe that the initial illegal search did not

---

[5] "Both the independent source rule and the inevitable discovery rule rest on assumptions that if the law enforcement agencies involved had eschewed the illegal activity, they nevertheless would have procured the evidence at issue. But the independent source rule applies only upon proof that *in actual fact* the officers did not obtain the challenged evidence *as a result* of the primary illegality; the inevitable discovery exception assumes that the evidence was in fact obtained as a consequence of the primary illegality but is invoked by proof that—hypothetically—if the officers had not engaged in the primary illegality, they would nevertheless although in a different manner have obtained the challenged evidence." (Emphasis in original.) 1 C. McCormick, Evidence (4th Ed. 1992) § 180, p. 739; see *Murray* v. *United States*, supra, 487 U.S. 540.

prompt the obtaining of the warrant." The defendant contends that initially the police had no information as to his residence and had not applied for either an arrest warrant or a search warrant when they went to his apartment on what he terms an "investigative fishing expedition."

The trial court, however, explicitly rejected this conclusion. The court found that the police contacted the defendant's father to ascertain where the defendant might be found. Based on the information the defendant's father provided, the police went to the apartment to see if the defendant lived there. When the police found the defendant there, it was their intention to secure a search warrant for the premises after the defendant's arrest. In the words of the trial court, "[i]t was clear from the very beginning . . . that once they had found [the defendant] in that apartment . . . they were going to go back and seek a warrant and search that apartment." The officers had been instructed by their superiors not to touch anything at the apartment because a search warrant would be applied for later. The court therefore found: "That leads the court to the conclusion that this search was going to take place. The police had always planned to undertake it."

"On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is 'clearly erroneous in view of the evidence and pleadings in the whole record . . . .' Practice Book § 4061; *State* v. *Oquendo*, [223 Conn. 635, 645, 613 A.2d 1300 (1992)]; *State* v. *Kyles*, supra, 221 Conn. 660. The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. *State* v. *Oquendo*, supra, 645; *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). Because a trial court's determination of the validity of a . . . search implicates a defendant's con-

stitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. See *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Damon*, 214 Conn. 146, 154, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990)." *State* v. *Trine*, 236 Conn. 216, 225, 673 A.2d 1098 (1996).

At the suppression hearing, Bridgeport police officer John Vivo, Jr. (Vivo), the defendant's father, testified that he was asleep on the night of February 23, 1994, when other police officers came to his home and informed him that his son was involved in a shooting and that the police did not know where to locate his son. Vivo was unsure where his son lived, but his fiance provided the address of an apartment where the defendant's mother had lived and stated that she thought the defendant lived there. Vivo, along with other officers wearing bulletproof vests and carrying shotguns, went to that apartment. The police were concerned that another suspect who was possibly involved in other homicides might also be in the apartment. When Vivo, leading the police, knocked on the apartment door, the defendant opened the door and admitted them. The police quickly went through the apartment as Sherbo handcuffed and arrested the defendant. Vivo was told by his supervisors not to touch anything as he looked through the apartment for other individuals because they were going to obtain a search warrant. Vivo did find a bulletproof vest in a bedroom closet and removed it, but was told to return it to the closet as a search warrant would be sought. Vivo also testified that he overheard other police officers say they had found a bag of bullets on or in a dresser, although he did not know exactly where they had found the bullets.

Sherbo testified that after speaking with Vivo, he went to the Green Homes Apartments with several detectives and uniformed officers to locate the defendant. There, Vivo knocked on the door to apartment 423 and the police identified themselves to the defendant. The defendant opened the door and Vivo entered the apartment followed by the other police. The defendant was immediately placed under arrest and handcuffed. Sherbo further testified that he conducted a search of the apartment looking for weapons or individuals with weapons. The defendant, after only one or two minutes, was then taken from the apartment, and Sherbo also left with the purpose of obtaining a search warrant for the premises.

Sherbo also denied searching any drawers and did not believe that he or other officers had seen any ammunition or weapons at the premises before he left to obtain the search warrant. He denied that the search warrant was based upon anything that he had seen in the apartment while he was there. Sherbo testified that the search warrant affidavit was based on the shooting incident and that he was seeking evidence regarding those shootings. The affidavit stated that the items sought pursuant to the warrant were ammunition, weapons, written instruments showing control of the apartment and specifically a nine millimeter handgun and nine millimeter ammunition, evidence of which was at the crime scene.

We do not agree with the defendant that these facts fail to support the trial court's finding that, once the police found the defendant at apartment 423, they then intended to secure a warrant for those premises. It is reasonable to conclude that, prior to finding the defendant at these premises, the police could not determine that the defendant lived there and, consequently, they had no probable cause to obtain a warrant for those premises. The situation changed when the defendant

was found at apartment 423. The police then had the grounds and reason to secure a warrant for those premises. Vivo had been told not to touch anything in the apartment because a warrant was going to be sought. The decision to seek a search warrant for evidence of the killing of Terron and the multiple shootings of Martinez at whatever location the defendant was found that night was entirely plausible. See *United States* v. *David*, 943 F. Sup. 1403, 1417–18 (E.D. Va. 1996). Furthermore, such a warranted search was "obviously relevant" to the investigation and undertaken in recognition by the police "that a warrant was necessary." *United States* v. *Johnson*, supra, 994 F.2d 987. While some officers may have overextended their protective search of the premises, the trial court reasonably could, and did, find that the officer seeking the warrant had no knowledge of the fruits of any such search. See *United States* v. *Curtis*, 931 F.2d 1011, 1013–14 (4th Cir. 1991). As the United States Supreme Court stated in *Murray* v. *United States*, supra, 487 U.S. 542 n.3: "To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred . . . ." We conclude, therefore, that the trial court's findings are not clearly erroneous and that the court made the required findings to support our conclusion that the nine millimeter cartridges were discovered based on a source independent of any unlawful search.

The defendant strongly argues that applying the independent source doctrine to these facts allows police to search a home for incriminating evidence and then later to apply for a search warrant to seize any evidence discovered. He argues that this makes a "sham" of the fourth amendment. In *Murray* v. *United States*, supra, 487 U.S. 539, the petitioners also argued that the independent source doctrine would remove "all deterrence to, and indeed positively encourage, unlawful police

searches." The petitioners believed that under the rubric of the independent source doctrine, police would make unlawful searches to determine whether it would be worth their time to seek a warrant for the premises. Id. The United States Supreme Court disagreed. "An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." Id., 540.

Here, the state was faced with the additional burden of demonstrating that independent of any unlawful search, the police intended to seek a search warrant for the defendant's apartment in addition to establishing probable cause for the warrant independent of that unlawful search. After hearing the evidence, the trial court properly found the state had met that burden. In these circumstances, we conclude that the defendant's fourth amendment rights were not violated.

The judgment is affirmed.

In this opinion the other justices concurred.