STATE OF CONNECTICUT *v.* JOHN H. ANDERSON
(AC 20958)

Foti, Flynn and Peters, Js.

Argued October 16—officially released December 25, 2001

*William T. Barrante*, with whom, on the brief, was *Patsy M. Renzullo*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, senior assistant state's attorney, with whom, on the brief, were *Frank S. Maco*, state's attorney, and *Dawn Gallo*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, John H. Anderson, appeals from the judgment of conviction, rendered after a conditional plea of nolo contendere, of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c.[1] On appeal, the defendant claims that the

---

[1] General Statutes § 53a-217c (a) provides in relevant part: "A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29-27, and (1) has been convicted of a felony . . . ."

court improperly denied his motion to suppress evidence. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the issues presented. The defendant resided in a trailer at site number fourteen in the Valley in the Pines Campground in Goshen.[2] On July 1, 1998, Troopers Joseph Martel and Paula Brunetto of the state police entered the campsite where the defendant's trailer was located. The troopers were responding to a complaint made by the owner of the campground, Raymond Tillman. Tillman alleged that the defendant was violating numerous campground regulations and sought his removal. In an evidentiary hearing on the defendant's motion to suppress various items seized by the troopers from the defendant's residence, Brunetto testified that upon arriving at the campsite, the troopers were cautioned by a number of the defendant's neighbors to "[b]e careful" because they had seen the defendant "cleaning guns at a table out in front of his camper." The troopers attempted to locate the defendant, but he was not present.

Tillman also told the troopers that the defendant had been storing, sandblasting, repainting and disassembling farm equipment in the vicinity of his campsite. At that time, the troopers also were investigating a larceny of farm equipment. While observing the area, the troopers noticed farm equipment lying on or in the proximity of the defendant's campsite. They contacted Stephen Kubish, a local farmer who earlier had reported the theft of farm equipment to the police, and asked him to come to the area to view the equipment. After viewing the equipment, Kubish identified some of it as the stolen property.

On the basis of their observations, Kubish's identification and the attendant circumstances, the troopers

---

[2] It is undisputed that the trailer was then the defendant's residence.

applied for and were granted a search warrant for the defendant's residence and the surrounding grounds. On July 8, 1998, the troopers, with prior knowledge that the defendant was a convicted felon, executed the search warrant and seized various items from his residence. On July 24, 1998, the police inventoried the items seized on July 8, 1998, which included, inter alia, a duffel bag filled with ammunition and a receipt for the purchase of a tractor. The receipt listed an M-1 rifle as collateral in the transaction. Two names appeared on the receipt, that of the defendant and Roger Kane, the person who had transferred the tractor to the defendant. Brunetto contacted Kane and confirmed the transaction. She also took a voluntary statement from Kane.

On August 5, 1998, Brunetto canvassed area gun shops, including Autumn Gun Works, Inc., which was the gun shop located nearest to the defendant's residence. Brunetto's investigation revealed that the owner of the gun shop, Christopher Marino, had purchased firearms from the defendant in the past. Those purchases, which occurred in June, 1996, and August, 1997, included several rifles, two handguns and a shotgun.[3] The gun shop previously had sold one of the firearms, a Walther pistol, to Jeffery Chrisey. On August 20, 1998, Chrisey gave Brunetto a statement and voluntarily turned over to her the Walther pistol that he had purchased from Autumn Gun Works, Inc.

On the basis of the evidence obtained from the gun shop canvass, an arrest warrant was issued, and the defendant was arrested on September 16, 1998, and charged with possession of a pistol or revolver.[4] Pursuant to Practice Book § 41-12,[5] the defendant timely filed

---

[3] Marino gave Brunetto documentary proof of those transactions.

[4] See footnote 1.

[5] Practice Book § 41-12 provides: "Upon motion, the judicial authority shall suppress potential testimony or other evidence if it finds that suppression is required under the constitution or laws of the United States or the state of Connecticut."

a motion to suppress the firearm he is accused of possessing, along with other evidence obtained during the July 8, 1998 search of his residence, or later obtained, as tainted fruit of an illegal search and seizure. The court denied the motion. The defendant entered a plea of nolo contendere conditioned on the right to take an appeal under Practice Book (2000) § 61-6 (a), now § 61-6 (2) (i).[6] The court accepted the plea and found the defendant guilty. This appeal followed. On appeal, the defendant claims that the court improperly denied his motion to suppress evidence that the police obtained from the July 8, 1998 search of his residence, as well as other evidence they obtained from further investigation.

When reviewing a court's findings and conclusions involving a motion to suppress evidence, we evaluate, in view of the whole record, whether the court's findings and conclusions were clearly erroneous. *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001). "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) Id.; *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

Specifically, the defendant challenges the court's denial of his motion on four grounds. He claims that (1) the search warrant application and subsequent warrant were neither presented to, nor issued by, a detached

---

[6] Practice Book (2000) § 61-6 (a), now § 61-6 (2) (i), provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. . . ."

and neutral magistrate, (2) the search warrant did not include sufficiently particular descriptions of items to be seized under article first, § 7, of the constitution of Connecticut, (3) the police search was beyond the scope of the search warrant and (4) the evidence obtained from further police investigation was "fruit of the poisonous tree."

Were we to assume, without deciding, that the warrant was invalid along with all of the evidence seized therefrom, we would conclude that the evidence obtained from the gun shop canvass is not inadmissible under the fruit of a poisonous tree doctrine[7] because the court properly admitted such evidence under the inevitable discovery doctrine.[8] The evidence obtained

---

[7] Our Supreme Court has explained that "the fruit of the poisonous tree doctrine . . . requires courts to exclude evidence that is the product or fruit of police conduct in violation of the [defendant's constitutional rights]." (Internal quotation marks omitted.) *State* v. *Ostroski*, 201 Conn. 534, 545, 518 A.2d 915 (1986).

[8] Because we reach this conclusion, we need not address the issues raised by the defendant regarding the validity of the search warrant. The defendant asserts that the state constitution affords more protection than the federal constitution does regarding search and seizure. Even assuming that to be true, it is clear that Connecticut courts, along with "the vast majority of all courts, both state and federal," recognize the inevitable discovery exception to the exclusionary rule as formulated by the United States Supreme Court. (Internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). As such, an increased level of protection that the state constitution might afford, in comparison to the federal constitution, is of no consequence once the challenged evidence satisfies the requirements of an exception to the exclusionary rule, as recognized by our Supreme Court. *State* v. *Cobb*, 251 Conn. 285, 338–39, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Colvin*, supra, 241 Conn. 655–56; *State* v. *Vivo*, 241 Conn. 665, 672–73, 697 A.2d 1130 (1997); *State* v. *Graham*, 200 Conn. 9, 20, 509 A.2d 493 (1986); see *Murray* v. *United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1998); *Nix* v. *Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

Moreover, without assuming the defendant's state constitutional claim to be correct, we still decline to address it because the claim is inadequately briefed. The defendant's claim is void of any real analysis and is almost entirely based on conclusory statements. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by

from the gun shop canvass is sufficient on its own to support the defendant's conviction because § 53-217c proscribes a convicted felon from possessing a "pistol or revolver."

In the seminal case of *Wong Sun* v. *United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), the United States Supreme Court set forth the basic rule that we adhere to today. The exclusionary rule requires that evidence obtained from prior illegal police activity must be suppressed if such evidence is found to be the fruit of that prior police illegality. Id. To be admissible, therefore, the challenged evidence must fit into an exception to the exclusionary rule. The inevitable discovery doctrine is such an exception, and we find it to be applicable in the present case. See *Murray* v. *United States*, 487 U.S. 533, 539, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1998); *State* v. *Cobb*, 251 Conn. 285, 337, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

In *Cobb*, our Supreme Court explained the inevitable discovery doctrine and its supporting public policy.[9] "Both the United States Supreme Court and [our Supreme Court] have explained the relationship between the independent source doctrine and the inevitable discovery doctrine. [The] inevitable discovery doctrine . . . assumes the validity of the independent source doctrine as applied to evidence initially acquired unlawfully. . . . The inevitable discovery doctrine,

failure to brief the issue properly." (Internal quotation marks omitted.) *Giulietti* v. *Giuliettti*, 65 Conn. App. 813, 840, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001). In addition, the defendant has failed to request that this court review his unpreserved state constitutional claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

[9] The inevitable discovery exception to the exclusionary rule is similar to the independent source exception to that rule, and, therefore, both exceptions are usually explained together. We follow that trend. See *Murray* v. *United States*, supra, 487 U.S. 539; *State* v. *Cobb*, supra, 251 Conn. 337–39.

with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered. . . . Both doctrines rest on the same premise: the interest of society in deterring unlawful police conduct and the public interest in having [fact finders] receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred. . . . Thus, if the [state] can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Cobb*, supra, 251 Conn. 337. The state must prove by a "preponderance of the evidence that the evidence would have been ultimately discovered by lawful means." *State* v. *Badgett*, 200 Conn. 412, 433, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

In *Badgett*, the court stated further that for evidence to be admissible, "the state must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued *prior* to the occurrence of the constitutional violation." (Emphasis in original.) Id. In *Cobb*, however, our Supreme Court subsequently stated that such requirements for the application of the inevitable discovery doctrine may not be rigid. *State* v. *Cobb*, supra, 251 Conn. 338–39.

On the basis of *Badgett* and *Cobb*, this court must make two determinations. First, as a threshold matter, we must determine whether the lawful means that made discovery inevitable were possessed by the police and

were being actively pursued prior to the issuance of the warrant. Second, we must determine whether the police would have discovered the challenged evidence had there been no unlawful search of the defendant's residence. Both of those determinations involve questions of fact. Id., 339.

We conclude that the lawful means, namely, the information given by the neighbors to the police, were possessed by the police and were being actively pursued prior to the issuance of the warrant. Credible evidence adduced at the hearing indicated that the police gained information concerning the defendant's possession of firearms on July 1, 1998, seven days before the alleged constitutional violation, when the neighbors informed them that the defendant had been "cleaning guns" near his campsite.[10] That began the investigation into the defendant's possible possession of firearms. That evidence demonstrates that the police possessed, prior to the alleged constitutional violations, the lawful means that made the discovery of future evidence inevitable.

That conclusion is further supported by Brunetto's testimony. She testified that she would have canvassed local gun shops irrespective of her conversation with Kane, who was identified on the tractor receipt, because there was prior evidence, garnered from the initial visit to the trailer park, that a convicted felon possessed a firearm. Brunetto further testified that the reports that the defendant possibly possessed multiple firearms would have resulted in a canvass of area gun shops because the defendant was known to be a convicted felon.

---

[10] Despite the defendant's arguments to the contrary, "it is well established that the evaluation of a witness' testimony and credibility is wholly within the province of the trier of fact." (Internal quotation marks omitted.) *Opotzner* v. *Bass*, 63 Conn. App. 555, 564–65, 777 A.2d 718, cert. denied, 257 Conn. 910, 782 A.2d 134 (2001). Therefore, we do not disturb the court's factual findings at the suppression hearing regarding the troopers' testimony.

Because we have concluded that the investigation commenced when the police received the information, the police were actively pursuing the matter when the warrant was issued and, therefore, the state has met the *Badgett* test as interpreted by *Cobb*. Moreover, despite the defendant's argument regarding the one month delay in the investigation between the time that the troopers went to the campground on July 1, 1998, and when they went to the Autumn Gun Works, Inc., shop on August 5, 1998, we apply the latitude suggested by *Cobb* to our determination of whether the police were actively pursuing the information prior to the issuing of the search warrant. The evidence adduced at trial indicated that the troopers continued with their investigation by canvassing local shops on August 5, 1998, roughly one month after they were informed of the defendant's possession of a firearm.

Because of the close proximity in time between the acquisition of the initial information, which commenced the investigation, and the actual canvassing of local gun shops, we are persuaded that the evidence falls within the *Badgett* test as interpreted in *Cobb*. As stated in *Cobb*, "[c]ircumstances justifying application of the inevitable discovery rule *are most likely to be present* if these investigative procedures were already in progress prior to the discovery via illegal means . . . or where the circumstances are such that, pursuant to some standardized procedures or established routine a certain evidence-revealing event would definitely have occurred later . . . ." (Citation omitted; internal quotation marks omitted.) Id., 339, quoting 5 W. LaFave, Search and Seizure (3d Ed. 1996) § 11.4 (a), pp. 249–50. The lawful means that made discovery inevitable, namely, the information gathered by the troopers on July 1, 1998, was possessed by the police, and they were actively pursuing the matter prior to the occurrence of the alleged constitutional violation.

Additionally, we conclude that the police inevitably would have discovered the challenged evidence. Testimony established that the neighbors informed both Brunetto and Martel that the defendant had been seen cleaning weapons outside of his trailer. Hypothetically, if the warrant subsequently were issued legally, the police would have obtained the receipt in the search. Thereafter, they would have questioned Kane and retrieved the M-1 rifle. Because we have assumed, however, without deciding, that the warrant in question was issued illegally, we must determine whether the police nevertheless would have obtained sufficient evidence of the defendant's possession of firearms. We conclude that they would have. The information given to the police by the neighbors would have prompted the police to canvass local gun shops. That canvass would have led police to Autumn Gun Works, Inc., a local gun shop. In the course of that inquiry, the police would have obtained the Walther pistol as well as other documentation detailing the defendant's involvement in other firearms transactions. Therefore, the police inevitably would have obtained sufficient evidence that a convicted felon was in possession of a firearm irrespective of any police illegality or any evidence obtained therefrom.

The troopers' testimony demonstrated by a preponderance of the evidence that the challenged evidence ultimately would have been discovered by lawful means, specifically, the troopers' canvass of the local gun shops. Any evidence obtained as a result of the troopers' canvass of the local gun shops cannot be characterized as "fruit of the poisonous tree" because further investigation, untainted by any illegality, uncovered such evidence. The factual basis of the court's findings was not clearly erroneous in light of the whole record, and its legal conclusions find support in the evidence and memorandum of decision, and are legally

and logically correct. The court properly held that the evidence obtained from the canvass of gun shops was not subject to suppression under the exclusionary rule and properly denied the defendant's motion to suppress such evidence.

The judgment is affirmed.

In this opinion the other judges concurred.