## STATE OF CONNECTICUT *v.* ANTHONY W. ROGERS
## (AC 31421)

Robinson, Bear and Borden, Js.

Argued May 20—officially released September 21, 2010

*John R. Williams*, for the appellant (defendant).

*Raheem L. Mullins*, assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *James M. Bernardi*, supervisory assistant state's attorney, and *Joseph C. Valdes*, assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Anthony W. Rogers, appeals from the judgments of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a, conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (5), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that the trial court abused its discretion by (1) granting the state's motion for joinder,[1] (2) denying his motions

---

[1] In granting the state's motion for joinder, the following informations were consolidated for trial. In docket number CR-06-107614, the state charged the defendant with attempt to commit assault in the first degree in violation of §§ 53a-49 and 53a-59 (a) (5) and carrying a pistol without a permit in violation of § 29-35 (a).

In docket number CR-06-113852, the state charged the defendant with murder in violation of §§ 53a-54a (a), conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), attempt to commit murder in violation of §§ 53a-54a (a) and 53a-49, and attempt to commit assault in the first degree in violation of §§ 53a-49 and 53a-59 (a) (5). After the close of the state's case, the court granted the defendant's motion for a judgment of acquittal as to the charge of attempt to commit murder.

Thereafter, the state filed a fifth amended information charging the defendant with murder in violation of § 53a-54a (a), conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), attempt to commit assault in the first degree in violation of §§ 53a-49 and 53a-59 (a) (5), and carrying a pistol without a permit in violation of § 29-35 (a).

to sever and (3) admitting evidence of uncharged misconduct. We affirm the judgments of the trial court.[2]

The jury reasonably could have found the following facts. In December, 2004, the defendant, a drug dealer, asked his girlfriend, Latoya Boyd, to purchase a six pistol gun case for him because he needed a place to store the guns he needed for protection. Boyd bought the gun case and gave it to the defendant with a note stating, "Merry X-mas baby." The defendant put his guns in the case, created combinations for the locks and gave the combinations to Boyd. A .25 caliber Beretta and a nine millimeter Glock handgun were in the defendant's gun case, among others.

At approximately 10 p.m. on January 12, 2005, the defendant entered a bodega at 42 Woodward Avenue in Norwalk. Alicea Castro, who owns the bodega with her husband, D'anicio Castro, and Abraham Vargas, a customer, were in the bodega when the defendant entered and began to argue with Vargas. Vargas was so intoxicated that he had to support himself on a newspaper stand. Castro told the defendant to leave. The defendant left but returned immediately, pointed a .25 caliber handgun at Vargas and fired it. The bullet did not hit Vargas, and the defendant fled. Alicea Castro called the police and identified the defendant from a photographic array as the person who shot at Vargas.

As he was sweeping the floor in the bodega the next morning, Francisco Valez found a spent shell casing, which he gave to the Castros. D'anicio Castro gave the shell casing to the Norwalk police, which, in turn, sent it to the department of public safety's scientific services division for forensic examination. On that same day the defendant told Boyd and his friend, Joshua Huckabee, that he shot off Vargas' hat because Vargas came at

---

[2] The court gave the defendant a total effective sentence of seventy-one years in prison.

him with a knife. Alicea Castro, however, never saw Vargas with a knife.

The Norwalk police obtained a warrant to search the apartment that the defendant shared with Boyd, their motor vehicle and the home of the defendant's parents. Only Boyd was in the apartment when the police executed the warrant on February 18, 2005. In the apartment, the police found marijuana, cocaine and an inordinate number of small plastic bags, the type typically used by drug dealers to package drugs for sale, and more than $3000. The police found the defendant in his motor vehicle and seized a firearm he had concealed on his person. In the defendant's room in his parents' home, the police found $10,415 and marijuana. The defendant and Boyd were arrested and charged with narcotics and drug violations. They posted bond and were released.

On April 9, 2005, just before 11 p.m., the defendant was near the bodega when he saw Jaime Cubillos leave the bodega. Cubillos was a Hispanic man who resembled Vargas, and, in the dark, the defendant mistook him for Vargas. The defendant followed Cubillos to Larsen Street where he shot Cubillos in the head, killing him instantly. The defendant fled the scene and had his mother drive him to his aunt's house in Bridgeport. When Boyd picked up the defendant at his aunt's house, he told Boyd that he had shot "the Spanish guy" from the bodega on Larsen Street. The next day the defendant also told Huckabee that he had shot "the Mexican guy" on Larsen Street because he thought the man was Vargas.

Kevin Brown, who lived on Larsen Street, left his house shortly after 11 p.m. on April 9, 2005, and saw Cubillos' body lying in the street in a pool of blood. Brown alerted the Norwalk police, who arrived along with medical personnel who pronounced Cubillos dead.

The police found a single spent shell casing twelve to fifteen feet from Cubillos' body. During the autopsy of Cubillos, associate medical examiner Malka B. Shah, a pathologist, removed fragments of the bullet and shell casing from Cubillos' skull and brain and gave them to a Norwalk police detective. The fragments were sent to the department of public safety for testing.

Alicea Castro and D'anicio Castro raised money to return Cubillos' body to his native country by putting photographs of Cubillos on collection cans they placed in their bodega. When the defendant saw the photograph of Cubillos, he told Boyd that he had shot the "wrong guy" because Cubillos was not the name of the man identified in the police report that the defendant had received in connection with the Vargas incident. The defendant stated, "fuck it, anyway." The defendant also told Huckabee that he had killed the "wrong guy."

On May 27, 2005, the defendant and Boyd appeared in court on the charges related to their February 18, 2005 drug arrests. When assistant state's attorney Michael A. DeJoseph called the case, an altercation occurred between him and the defendant. The court found the defendant in contempt and sentenced him to thirty days in jail. Thereafter, the defendant instructed Boyd to give his gun case to Huckabee. In addition to the gun case, Boyd gave Huckabee a handgun and a long rifle, which Huckabee put under his bed in the attic of his house.

The defendant served his thirty day contempt sentence in the Bridgeport correctional facility, where he shared a cell with Barry Bersek. The defendant was irate about the incident involving DeJoseph. He told Bersek that he was going to kill DeJoseph and that he knew DeJoseph's jogging routes. Given the defendant's willingness to commit murder, Bersek, an admitted con man, saw the defendant as his "get out of jail ticket." To that end, Bersek fabricated a plan under which the

defendant would agree to commit a crime. Before the crime was committed, however, Bersek intended to report the planned crime to the police in return for a possible reduction in the amount of time he had to serve in jail.

In carrying out his scheme, Bersek first gained the defendant's trust by telling him about the crimes he himself had committed. Bersek told the defendant that he was a compulsive gambler who stole personalty and then sold it to Mafia "wise guys . . . ." The defendant let Bersek know that he was not making enough money selling drugs and was looking for a way to make more money. The defendant also told Bersek that he had five or six guns. In response, Bersek informed the defendant that he knew members of the Mafia who were looking for a hit man and suggested that the defendant become a Mafia hit man. The defendant told Bersek that he had killed people in the past. Bersek continued to con the defendant by telling him that Mafia rivals were taking over different gambling territories and needed people killed right away, and that the defendant could make $75,000 if he committed the murders. The defendant was unaware that the gambling ring and Mafia rivals were fictitious. The defendant, believing that he would be released from jail in thirty days, agreed to meet Bersek with the guns in Grand Central Station in New York City. The defendant gave Bersek his mother's telephone number so that they could contact each other when the defendant was released from jail. Bersek intended to inform the police of the plan and to have the defendant arrested at Grand Central Station.

Bersek was released from jail before the defendant, and he informed Norwalk police Sergeant Arthur Weisgerber of the defendant's plan to murder the fictitious Mafia rivals. Before he was released from jail, however,

the defendant was taken into custody by federal authorities on gun possession charges arising out of the February 18, 2005 search. Bersek therefore revised the plan he made with the defendant from having the defendant commit murder to supplying the guns to be used by others to commit murder. After enlisting the help of the Norwalk police, Bersek communicated with the defendant's mother and eventually with Boyd.

When he heard of the revised plan, the defendant wanted his guns to be used to commit the Mafia murders. The defendant agreed to sell his guns because Bersek told him that he would be paid well for them. The defendant told Boyd that he wanted to be paid at least $25,000 for the sale of the first gun. In preparation for the sale, the defendant instructed Boyd not to touch the gun to avoid leaving any fingerprints on it, get the money from Bersek up front, use a different telephone each time she spoke to Bersek, make Bersek open his shirt when she met him to ensure that he was not wearing a recording device, take the bullets out of the gun before handing it to Bersek and take the defendant's sister with her for protection.

To sell the first gun, Boyd told Huckabee that she needed one of the guns he was holding for the defendant. Huckabee gave her a nine millimeter handgun. Boyd put the gun in a bag and met Bersek at a parking lot in Norwalk on October 7, 2005. Bersek was accompanied by a man he introduced as "Sonny," one of the Mafia "guys" from New York who wanted to buy a gun to commit a murder. "Sonny," however, was special agent James Sullivan of the federal Bureau of Alcohol, Tobacco and Firearms. "Sonny" gave Boyd $200 for the gun, explaining that that sum was a good faith showing that Boyd and the defendant would get the rest of the money after the murders were committed. "Sonny" wanted to buy another gun, but Boyd told him that she would have to ask the defendant. When she spoke to

the defendant, he scolded Boyd for not getting all of the $25,000 up front but agreed to sell another one of his guns.

Boyd sold "Sonny" a second handgun on October 13, 2005, after she got a .25 caliber pistol from the gun case Huckabee was keeping for the defendant. Boyd met Bersek and "Sonny" at the Interstate 95 rest stop in Darien. When "Sonny" got into Boyd's automobile, she told him that the gun was loaded and ready to use. When "Sonny" told her that he was going to use the gun to commit murder, Boyd told him to "just put it right behind his head when you use it and it will work fine." "Sonny" gave Boyd $100, and she gave him the .25 caliber handgun.

On November 28, 2005, agents from the federal Bureau of Alcohol, Tobacco and Firearms informed Boyd that she had sold the guns to an undercover officer. Boyd agreed to cooperate with the investigation and told the agents about the gun case stored at Huckabee's house. She also gave the agents the combination to the locks. The agents searched Huckabee's house and found the gun case under his bed. Inside the gun case, the agents found a nine millimeter Glock handgun, several packets of ammunition and various items of drug paraphernalia.

Forensic examiners at the department of public safety were able to connect the guns Boyd sold to "Sonny" and the guns in the gun case to the Vargas incident and to Cubillos' murder. The spent shell casing found at the murder scene was fired from the nine millimeter Glock handgun and the bullet fragments removed from Cubillos' skull and brain were fired from that gun. The shell casing found at the bodega had been fired from the .25 caliber pistol that Boyd sold to "Sonny" on October 13, 2005. The defendant did not have a local or state permit to own a gun in 2005.

The defendant subsequently was arrested and charged under the two informations that resulted in the convictions that are the subject of this appeal as well as a third information related to the narcotics and drug violations.

Prior to trial, the state filed a motion to join the three informations for trial and notice of its intention to use other acts of the defendant's misconduct as evidence. In the motion, the state represented that the defendant was charged with murder and conspiracy to commit murder in an information scheduled for jury selection in October, 2007. The defendant also had charges pending against him in seven other criminal files. The state argued that in two of the other cases, the defendant's acts and the evidence against him were relevant to the murder and conspiracy to commit murder charges, and, therefore, the cases should be joined for trial. The state also sought to admit evidence from other cases being prosecuted by state and federal authorities. In its motion, the state summarized the evidence related to the cases it sought to join for trial. The defendant objected, claiming that the state's motion was in violation of State v. Boscarino, 204 Conn. 714, 529 A.2d 1260 (1987). The court granted the motion for joinder as to the murder and conspiracy charges with the attempt to commit assault charge. It denied the motion as to the drug charges because it concluded that joinder of these charges would be overly prejudicial to the defendant.

In its memorandum of decision, the court quoted from case law on the subject of joinder. "In Connecticut, joinder of cases is favored. . . . Joinder expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once. . . .

"Despite this deferential standard, the court's discretion regarding joinder, however, is not unlimited; rather, that discretion must be exercised in a manner consistent with the defendant's right to a fair trial. . . . [Our Supreme Court has recognized] that an improper joinder may expose a defendant to potential prejudice for three reasons. First, when several charges have been made against the defendant, the jury may consider that a person charged with doing so many things is a bad [person] who must have done something, and may cumulate evidence against him . . . . Second, the jury may have used the evidence of one case to convict the defendant in another case even though that evidence would have been inadmissible at a separate trial. . . . [Third] joinder of cases that are factually similar but legally unconnected . . . present[s] the . . . danger that a defendant will be subjected to the omnipresent risk . . . that although so much [of the evidence] as would be admissible upon any one of the charges might not [persuade the jury] of the accused's guilt, the sum of it will convince them as to all. . . .

"General Statutes § 54-57 and Practice Book § [41-19] expressly authorize a trial court to order a defendant to be tried jointly on charges arising separately. In deciding whether to sever informations joined for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . *The defendant bears a heavy burden of showing that the denial of severance resulted in substantial injustice and that any resulting prejudice was beyond the curative power of the court's instructions.* . . . [W]hether a joint trial will be substantially prejudicial to the rights of the defendant . . . means something more than that a joint trial will be less advantageous to the defendant. (Emphasis in original; internal quotation marks omitted.) *State* v. *Swain,* 101

Conn. App. 253, 258–59, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007).

"In *State* v. *Boscarino*, supra, 204 Conn. 722–24, the court identified three factors that should be considered in order to avoid the aforementioned risks. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred. . . . *State* v. *Swain*, supra, 101 Conn. App. 259." (Internal quotation marks omitted.)

In ruling on the state's motion for joinder, the court concluded that the defendant's objection to the motion failed under *Boscarino*. Although the defendant conceded that the " 'charges involve discrete, easily distinguishable factual scenarios,' " he claimed that Cubillos' murder was " 'brutal and shocking.' " The court reasoned that the allegations "surrounding Cubillos' murder do not involve prolonged anguish, gratuitous injuries, prior taunting or any other claims that might inflame the jury's passion. Instead, the murder, while tragic and upsetting, was committed in a relatively clinical fashion. Indeed [our Supreme Court] has held that [w]hile any murder involves violent and upsetting circumstances, it would be unrealistic to assume that any and all such deaths would inevitably be so brutal and shocking that a jury, with proper instructions to treat each killing separately, would necessarily be prejudiced by a joint trial. *State* v. *Herring*, 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); see also *State* v. *Hair*, 68 Conn. App. 695, 700–701, 792 A.2d 179, cert. denied, 260 Conn. 925, 797 A.2d 522 (2002)." (Internal quotation marks

omitted.) The court therefore concluded that Cubillos' murder was not so "brutal or shocking" under *Boscarino*.

In his objection to joinder, the defendant claimed that joinder would prejudice him by extending the length of the murder trial. The court found that the defendant had cited no case law and provided no analysis to support his claim. The defendant failed to articulate how the duration or complexity of the trial substantially would prejudice him if the charges were joined. The court further reasoned that in light of apparent cross admissibility and the presumption in favor of joinder, it could not conclude that the additional charges would extend the length of the trial or increase its complexity so as to confuse the jury and unfairly prejudice the defendant.[3] Apart from the role that cross admissibility plays in the *Boscarino* analysis, the court noted an independent basis for joinder under *State* v. *Pollitt*, 205 Conn. 61, 530 A.2d 155 (1987), in which our Supreme Court stated: "Where evidence of one incident *can* be admitted at the trial of the other, separate trials would provide the defendant no significant benefit. It is clear that, under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial." (Emphasis in original.) Id., 68.

With respect to the charges under all three informations, the court concluded that evidence related to the charges would be admissible in the murder trial pursuant to Connecticut Code of Evidence § 4-5 (b), subject to individual rulings by the court. The court, however, was concerned with the cumulative effect of joining the drug charges with the murder charge due to the

---

[3] The court found that neither the state nor the defendant provided the court with a list of witnesses, an exhibit list or a reasonable estimate as to the length of trial.

risk that the jury would view the defendant as a " 'bad person.' " It ultimately concluded that the potential for prejudice cautioned against joinder of the drug charges with the murder and attempt to commit assault informations.[4] The court therefore granted the motion to join the charges arising out of the Vargas incident with the murder incident.[5]

I

On appeal, the defendant claims that the court abused its discretion "in joining all of these highly inflammatory charges into a single trial and in thereafter denying the defendant's motion to sever them."[6] We decline to review this claim due to inadequate briefing. In his objection to the motion for joinder, the defendant claimed that the Cubillos murder was brutal and shocking and that the trial would be overly long and complex. The defendant made the same conclusory statements in his brief on appeal,[7] but he did not confront the reasoning of the court in its memorandum of decision or cite the facts of the murder case and distinguish them from the precedents of this court and our Supreme Court. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Anderson*, 67 Conn. App. 436, 441–42 n.8, 787 A.2d 601 (2001).

---

[4] The court stated that its ruling with respect to the issue of nonjoinder of the drug charges did not control whether the evidence relating to those charges was admissible in the murder case.

[5] The court noted that any prejudice arising from the joinder of those charges could be cured with an appropriate jury instruction.

[6] With respect to the defendant's claim concerning the denial of his motion to sever, in his brief on appeal, he provides no analysis or law on the subject of severance. We therefore deem that claim abandoned. See, e.g., *State* v. *Gonzalez*, 106 Conn. App. 238, 240 n.1, 941 A.2d 989, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

[7] The defendant conceded in his brief that joining the charges of attempted assault and carrying a pistol without a permit with the murder charges would pass muster under the *Boscarino* test.

## II

The defendant's second claim is that the court abused its discretion and prejudiced him by admitting evidence of uncharged misconduct having little or no relevance to the crimes with which he was charged. This claim is minimally briefed and fails to support the defendant's more specific claim that evidence of his conspiring with Bersek was not relevant or material to the crimes with which he was charged or how that evidence outweighed its prejudicial effect.

"The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Citation omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 393, 796 A.2d 1191 (2002).

"To admit evidence of prior misconduct properly, two tests must be met. The evidence (1) must be material and relevant, and (2) its probative value must outweigh the prejudicial effect of the evidence. . . . Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Relevant evidence is defined in the Connecticut Code of Evidence, § 4-1, as evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. The commentary to that section makes it clear that there are two separate components of relevant evidence

at common law, probative value and materiality. Evidence is relevant if it tends to support the conclusion even to a slight degree. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Internal quotation marks omitted.) *State* v. *Aaron L.*, 79 Conn. App. 397, 409, 830 A.2d 776 (2003), aff'd, 272 Conn. 798, 865 A.2d 1135 (2005).

The essence of the defendant's claim is that the court abused its discretion by admitting evidence concerning the defendant's conspiring with Bersek and the sale of guns to "Sonny." The defendant failed, however, to explain how that evidence was not relevant to the attempt to commit assault, gun possession or murder charges. The sale of the guns to "Sonny" was the means by which the state identified the gun that the defendant used in the attempted assault on Vargas and the one he used to murder Cubillos. The defendant's conversations with Bersek were the core of the conspiracy to commit murder charge. The evidence, therefore, was relevant and material to the charges against the defendant, and its probative value outweighed its prejudicial effect.

The judgments are affirmed.

In this opinion the other judges concurred.