## STATE OF CONNECTICUT *v.* GANESH BHARRAT
## (AC 31734)

Gruendel, Harper and Flynn, Js.

September 13, 2010—officially released May 24, 2011

*Adele V. Patterson*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Michael W. Riley*, assistant state's attorney, and *Sandra L. Tullius*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Ganesh Bharrat, appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a, felony murder in violation of General Statutes § 53a-54c, burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and larceny in the third degree in violation of General Statutes § 53a-124 (a) (1).[1] The defendant claims (1) that the trial court improperly failed to deliver an instruction on the defense of diminished capacity; (2) that the court's instruction concerning evidence of intoxication, as it related to the crime of murder, was deficient; (3) that the evidence was insufficient to prove that he committed felony murder; and (4) that the court improperly expanded the offense of felony murder. We affirm the judgment of the trial court.

The jury reasonably could have found that, on December 24, 2005, the defendant met the victim, Jose Morales, in a bar. After conversing with the victim, the defendant accompanied the victim to the victim's apartment in Hartford. Later that evening, after the victim had fallen asleep, the defendant entered the victim's bedroom and stabbed the victim numerous times with a knife, thereby

---

[1] The court imposed a total effective sentence of fifty-five years imprisonment.

causing his death. The defendant left the victim's apartment with the keys to the victim's automobile as well as the victim's wallet and cellular telephone. The defendant drove away from the scene in the victim's automobile, later renting the automobile to Henry Garcia. The defendant used the victim's cellular telephone and, later, stashed the victim's wallet and house keys in the apartment where he had been living at the time of the crimes. Later, police discovered the murder weapon and the bloodstained clothing worn by the defendant at the time of the murder, both of which contained the victim's genetic material, in the defendant's apartment. By means of statements that the defendant made to the police, he fully implicated himself in the victim's murder. Referring to the victim's death, the defendant stated to the police, "He got what he deserved. I did what I had to do." Additional facts will be set forth as necessary.

## I

First, the defendant claims that the court improperly failed to deliver an instruction on the defense of diminished capacity. We disagree.

The record reflects that the defendant submitted an amended request to charge in which he asked the court to deliver a diminished capacity instruction with regard to the crime of murder.[2] Prior to delivering its charge,

[2] The requested instruction stated: "Based on the evidence that has been presented in this case the defense maintains that the [defendant's] behavior, statements and intoxication reveals that his mental faculties were limited or impaired at the time of the incident, and when he was giving his statement to the police. This requires that I instruct you on the legal doctrine of diminished capacity as it applies to this case.

"As I explained a moment ago, an essential element of the crime of [m]urder, with which the defendant is charged, is that he acted with the intent to cause . . . the death of another person. A person acts intentionally with respect to a result or to conduct when his conscious aim or objective is to cause such result or to engage in such conduct.

"The doctrine of diminished capacity means that if the defendant, because of a limited or impaired mental capacity, did not have that specific intent to commit the acts which comprise the crime of murder, because of a limited

the court, concluding that the evidence did not support the requested instruction, indicated that it would not deliver the instruction. The defendant's attorney stated that the evidence of the defendant's state of mind supported the instruction and took an exception to this ruling. In its charge, the court delivered general instructions concerning specific and general intent. Thereafter, the court delivered an instruction concerning the offense of murder: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt: Element one, intent to cause death. The first element is that the defendant specifically intended to cause the death of another person. There is no particular length of time necessary for the defendant to have formed the specific intent to kill. A person acts intentionally with respect to a result when his conscious objective is to cause such result. And I refer you back to the specific intent instruction. . . .

"[The] second element is that the defendant, acting with the intent to cause [the] death of another person, caused the death of Jose Morales. This means that the defendant's conduct was the proximate cause of the victim's death. You must find it proved beyond a reasonable doubt that Jose Morales died as a result of the actions of the defendant.

"In summary, the state must prove beyond a reasonable doubt that the defendant intend[ed] to cause the

or impaired mental capacity, then the element of intent would not have been proven in this case.

"In this regard, I remind you that the state has the burden to establish the element of the defendant's intent to murder, beyond reasonable doubt. The defendant does not have to prove that he did not have the intent. In deciding whether the defendant had the requisite intent, you must consider all the evidence bearing on that issue, including the evidence of the defendant's limited or impaired mental capacity and his conduct before, during and after the incident in question."

death of another person and . . . with that intent the defendant caused the death of Jose Morales. If you find unanimously, beyond a reasonable doubt, that the state has proven all of the element[s] of murder, including identity, and disproved beyond a reasonable doubt intoxication,[3] then you will find the defendant guilty of murder. If you unanimously find the state has not proven an element . . . then you will find the defendant not guilty." At the conclusion of the court's charge, the defendant's attorney renewed his objection.

The defendant contends that the evidence supported the requested instruction and, thus, that the court's refusal to deliver the instruction was in error.[4] "If [a] defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction. . . . The defendant's right to such an instruction is founded on the principles of due process. . . . Before an

[3] Prior to delivering its murder instruction, the court instructed the jury to consider whether the defendant was under the influence of narcotics or alcohol at the time that the acts in question allegedly had occurred and "what effect, if any, his voluntary intoxication had on his ability to form the specific intent required to commit the alleged crimes."

[4] Although, if warranted by the evidence, a diminished capacity instruction could have been applied to all of the specific intent crimes with which the defendant stood charged, the defendant only requested this instruction with regard to the murder count. See footnote 2 of this opinion. The defendant asserts in his brief that the court's "failure to instruct the jury on diminished capacity requires reversal of each count of conviction and [a] remand for a new trial." By failing to request that the instruction be given in the context of any other offense, the defendant did not preserve this issue of instructional error with regard to any charged offense except murder. The defendant does not claim that the court had a duty, sua sponte, to deliver this instruction with regard to any other offense, let alone seek any level of extraordinary review for such a claim. In his reply brief, the defendant merely asserts that, had the court delivered the instruction in the context of its murder instructions, the jury would have considered diminished capacity in the context of all of the charged offenses. We review only the issue properly preserved for appeal.

instruction is warranted, however, [a] defendant bears the initial burden of producing sufficient evidence to inject [the defense] into the case. . . . Conversely, the court has a duty not to submit to the jury, in its charge, any issue upon which the evidence would not reasonably support a finding." (Citation omitted; internal quotation marks omitted.) *State* v. *Lynch*, 287 Conn. 464, 470–71, 948 A.2d 1026 (2008). It is of no consequence if the evidentiary foundation for the request to charge is "weak or incredible," and we must consider the evidence in "the light most favorable to supporting the defendant's request to charge." *State* v. *Adams*, 225 Conn. 270, 283, 623 A.2d 42 (1993).

"[E]vidence [regarding a defendant's mental capacity] is admitted not for the purpose of exempting a defendant from criminal responsibility, but as bearing upon the question of whether he possessed, at the time he committed the act, the necessary specific intent, the proof of which was required to obtain a conviction." *State* v. *Hines*, 187 Conn. 199, 204, 445 A.2d 314 (1982). "To warrant consideration of diminished capacity . . . the defendant must have presented evidence which might have raised a reasonable doubt as to the existence of the specified mental state." (Internal quotation marks omitted.) *State* v. *Pagano*, 23 Conn. App. 447, 450, 581 A.2d 1058, cert. denied, 217 Conn. 802, 583 A.2d 132 (1990).

"To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person . . . cause[d] the death of such person or of a third person . . . . [T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Citation omitted; internal quotation marks omitted.)

*State* v. *Aviles*, 107 Conn. App. 209, 217, 944 A.2d 994, cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

We turn to a discussion of the evidence upon which the defendant relies to demonstrate that there was an evidentiary foundation for his requested instruction. The defendant draws our attention to the testimony of Timothy Shaw, a Hartford police detective at the time of his investigation of the victim's murder. Shaw testified that prior to his arrest, the defendant voluntarily participated in an interview at the Hartford police department. During the early part of the interview, the defendant stated that "at some times he would see people killed" and that these killings he envisioned occurred "first by shooting and then by stabbings." When asked if he believed he was capable of killing anyone, the defendant replied that "he wasn't sure." Shaw testified that the defendant did not appear to exhibit any mental disorder at the time of the interview and that the defendant did not state that any of the acts in question were precipitated by a mental condition.

Shaw testified that during the interview the defendant stated that he was friends with Annette Deonarine and her husband, Yaadram Deonarine. The defendant stated that he had resided in the same building with the couple, and that he loved and was involved in a sexual relationship with Annette Deonarine. The defendant stated that he was in an alcohol and drug rehabilitation program on the date of the murder; he stated that "[h]e was told by Annette that if he cleaned up his drug and alcohol problems, that she would allow him back into the house and he could return. Until he did so, she wouldn't allow him anywhere near the house or the kids." The defendant stated that, earlier on the date of the murder, he had been upset because he "had received some information that Annette was supposedly cheating on him with another person." He was agitated, began to stab some

furniture with a knife and told another individual that he wanted to kill Annette Deonarine.

The defendant admitted to the police that he caused the victim's death but also implicated Yaadram Deonarine in the crime. The defendant stated that Yaadram Deonarine asked him to kill the victim because his wife, Annette Deonarine, was having an affair with the victim. The defendant stated that Yaadram Deonarine met with him days prior to the murder, at which time Yaadram Deonarine provided him with the knife he used in the murder as well as $100. According to the defendant, on the day of the murder Yaadram Deonarine drove him to a bar at which the victim was present and instructed him to become acquainted with the victim. He stated that he struck up a conversation with the victim and, during the conversation, the victim told him that he was in a relationship with a woman named Annette who lived at the address of Annette Deonarine. This upset the defendant. The defendant stated that he left the bar with the victim, and that he and the victim purchased alcoholic beverages and crack cocaine before driving to the victim's residence. He stated that, after he and the victim drank the alcoholic beverages and ingested the crack cocaine, he asked the victim if he could stay at his residence because it was Christmas Eve and he needed a place to stay. The victim agreed. The defendant recalled that, after the victim went to bed, he entered his bedroom and stabbed him, causing his death.

The defendant told the police that, after he had killed the victim, he left the residence with the victim's wallet, cellular telephone and the keys to his automobile. He left the scene in the victim's automobile. In a written statement that the defendant provided for the police, he stated that, later, Yaadram Deonarine asked him to kill his wife and that he planned for the defendant to return to his native country, Guyana. Additionally, the

defendant told the police that he had had sexual relations with Annette Deonarine that led to pregnancies, and that the pregnancies ended in two miscarriages and an abortion.[5] The defendant expressed his desire that Yaadram Deonarine "get [what] he deserved for his involvement [in the crime]." Shaw testified that the police were unable to corroborate key aspects of the defendant's story insofar as the police did not find any evidence that Yaadram Deonarine was involved in the crime or that the defendant had a sexual relationship with Annette Deonarine.

Additionally, during the cross-examination of Shaw by defense counsel, the following colloquy took place:

"Q. . . . [D]uring that part of the conversation [early in the interview], was [the defendant] talking to you about how he suffered from bipolar disorder and that he heard voices that would tell him to do things?

"A. Yes.

"Q. And it was part . . . of that conversation that you also spoke about, that, when he would drink water, he felt like he was drinking blood?

"A. Yes.

"Q. And then you asked him if he thought he was capable of killing someone?

"A. Correct.

"Q. And he said, I'm not sure.

"A. Yes."

Also, the defendant draws our attention to the testimony of Annette Deonarine, who testified that, approximately two years prior to the events at issue, the

---

[5] In the defendant's written statement to the police, he stated that he had had a sexual relationship with Annette Deonarine, that he was "madly in love with her" and that he had left her residence because he had been "drinking and drugging," activities that had upset her.

defendant resided with his family in the same building where she and her husband at the time, Yaadram Deonarine, had resided. Thereafter, for a couple of months, the defendant lived in the Deonarines' apartment and, later, in a storage area of the Deonarines' apartment. Annette Deonarine testified that, after a few months, she and her husband asked the defendant "to move out because there was obviously something wrong." She testified that she could not ascertain the nature of the problem but described the defendant as having "a drinking issue . . . [h]e looked drunk." She also described finding evidence of drug use by the defendant.

Annette Deonarine testified that she had contact with the defendant from the time that he left her residence in 2003 until the fall and winter of 2005. She stated that, by this time, the defendant's physical condition had deteriorated in that the defendant had lost weight, appeared dirty and "looked like he lived [on] the street." She testified that the defendant had spent time "in the hospital" and "was admitted a couple of times to the Institute of Living [a mental health facility in Hartford]." Annette Deonarine testified that she began to avoid contact with the defendant and would not let him anywhere near her residence because she was afraid of him. She testified that her relationship with the defendant was based upon her desire to help the defendant, whom she viewed to be a person in need. She testified that the relationship was not romantic in nature. She agreed that the defendant had been "somewhat obsessed with [her]," having told people that he was the father of her children.

There was evidence that, after the defendant took the victim's cellular telephone, he used it to call Annette Deonarine. Additionally, there was evidence that, following the defendant's arrest and while he was incarcerated awaiting trial in this matter, he sent Annette Deonarine letters and hand-drawn pictures.

Further, the defendant relies upon the testimony of Garcia. Garcia testified that he knew the defendant "[f]rom the streets," in that the defendant frequently purchased illegal drugs from him. He described the defendant as "the type of person you don't want to be around" because he "brings . . . the cops around with him . . . [and] chases you for money to get high." Garcia testified that, on December 30, 2005, the defendant let Garcia use an automobile in exchange for a quantity of crack cocaine. Garcia testified that, during his history of selling the defendant drugs, the defendant typically exchanged food that he had obtained from his job at a restaurant for crack cocaine. He also testified that he and the defendant had used illegal drugs together. He stated that the defendant had told him that "he had a lady" and that "he had a kid."

We carefully have reviewed all of the evidence upon which the defendant relies to demonstrate that there was an adequate evidentiary basis for his requested instruction.[6] We have considered the evidence in the light most favorable to the suggested instruction. We conclude that the evidence, whether viewed in isolation or in its entirety, did not support a reasonable finding that the defendant was incapable of forming the intent to kill the victim on December 24, 2005.

---

[6] In his written request to charge, the defendant, in accordance with Practice Book § 42-18, argued that the evidence supported the requested instruction as follows: "In statements to the police [the defendant] claimed to suffer from [bipolar] disorder and that he heard voices. There was no evidence found to support his claim that Mr. [Yaadram] Deonarine paid or solicited [the defendant] to kill anyone, and there is no evidence to support [the defendant's] statement that he had a romantic relationship with Annette Deonarine, had sexual relations with her, or impregnated her. These are all examples from which the jury could infer that [the defendant] was disordered and delusional in his thinking. [The defendant's] written statement about his use of crack cocaine and alcohol. The testimony of Detective Shaw, Henry Garcia and Annette Deonarine." These arguments are consistent with the arguments set forth in the defendant's appellate brief.

The defendant focuses upon the evidence of his expressed beliefs concerning and behavior toward Annette Deonarine. He describes his beliefs toward Annette Deonarine as "delusional" in nature. Also, the defendant urges us to consider his statements concerning his mental condition as well as the evidence that he had a history of drug and alcohol abuse. He claims: "[T]he jury had evidence from which [it] could have inferred [that the] defendant long suffered from a genuine obsession and delusions. The jury could find [that] his mental condition was serious enough to cause him to lose his home and to be twice hospitalized at the Institute of Living. The jury could find [that] he was addicted to drugs and that he ceased to care for his own physical needs, [forgoing] food, becoming dirty, gaunt and appear[ing] ill. The jury could have inferred from the strength and persistence of this delusion that what [the] defendant told Detective Shaw reflected not clear minded intent but a delusional mind of diminished mental capacity that prevented the formation of specific intent."

The flaw in the defendant's argument is that none of the evidence upon which he relies supports a reasonable finding that, at the time of the murder, he was unable to form the intent to kill because of a mental condition or incapacity. The defendant portrays a series of irrational decisions leading up to the victim's murder by stressing, among other things, that the evidence showed him to be a person living on the streets, making poor decisions and under the influence of drugs and alcohol.[7] He attempts to demonstrate that "delusional"

[7] We note that, in light of the evidence, the court delivered a thorough instruction concerning intoxication. The court instructed the jury to consider evidence that the defendant had introduced substances into his body, whether he was under the influence of an intoxicant at the time of the alleged crimes and what effect, if any, intoxication had on his ability to form the specific intent to commit any of the crimes with which he stood accused. The adequacy of this instruction is addressed in part II of this opinion.

beliefs concerning his relationship with Annette Deonarine were a major factor in his causing the victim's death. He also points to the fact that the police were unable to corroborate his statements that implicated Yaadram Deonarine in the victim's murder. Certainly, this evidence was relevant to an understanding of the defendant's motive in killing the victim. That is, if deemed to be credible, it explained why the defendant stabbed the victim to death. It was not, however, relevant to understanding whether the defendant, at the time he was in the victim's apartment on December 24, 2005, had the ability to accurately perceive events related to the victim's well-being and, specifically, to intend to kill the victim. In resolving a similar type of claim, this court concluded that evidence that "[has] nothing to do with [the defendant's] state of mind at the time of the crimes" did not support a requested charge on diminished capacity. *State* v. *Kendall*, 123 Conn. App. 625, 673, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010). That rationale applies with equal force to the present claim insofar as the evidence at issue was not related to any incapacity that existed, rendering the defendant incapable of intending to kill at the time of the murder.

We recognize that there was some evidence that the defendant had been hospitalized, considered himself to be "bipolar," stated that he had "heard voices," and recalled feeling that drinking water was the equivalent of drinking blood. This evidence, coming for the most part from the defendant himself, did not afford the jury a sufficient basis upon which to conclude that a mental impairment of the defendant affected his ability to form the requisite specific intent. We do not hold that a defendant need present expert testimony to demonstrate the existence of a mental impairment, as lay testimony concerning such impairment is admissible. See, e.g., *State*

v. *Burge*, 195 Conn. 232, 239, 487 A.2d 532 (1985). None-theless, the evidence of such impairment must be of such a nature that the jury is entitled to rely upon it in assessing whether a defendant had the ability to formulate the requisite intent for the commission of the crime. We evaluate the evidence to determine whether the jury reasonably could have drawn a conclusion con-cerning an inability to form the specific intent. In so doing, we are mindful that the jury, as fact finder, is not entitled to engage in speculation or conjecture; it may only draw reasonable inferences from compe-tent evidence.

There was no evidence that the defendant was hospi-talized for a specific mental disorder, and the defen-dant's description of himself as "bipolar" was not an adequate evidentiary basis for the instruction; no wit-ness, lay or expert, explained the term "bipolar" to the jury. As this court has observed, the mere use of clinical terms related to mental impairment, without adequate accompanying information, does not constitute "evi-dence of the effects" of such conditions. *State* v. *Pagano*, supra, 23 Conn. App. 452. In *Pagano*, this court explained: "While a jury is entitled to infer impairment from intoxication because it is an effect which is com-mon knowledge and is an inference which is clearly within the ability of the jurors, as laypersons, to draw based on their own common knowledge and experience . . . a jury should not be allowed to make a similar leap in reasoning when dealing with diminished capacity. Unlike the effects of intoxication, the effects of complex mental disorders are not commonly known to layper-sons." (Citation omitted; internal quotation marks omit-ted.) Id.

For the reasons set forth previously, we conclude that the court's refusal to instruct the jury on diminished capacity was justified by the defendant's failure to pre-sent any evidence that a mental disorder hampered

his ability to form the requisite specific intent for the commission of the crime.

## II

Next, the defendant claims that the court's instruction concerning evidence of intoxication, as it related to the crime of murder, was deficient. We do not reach the merits of this claim because it was implicitly waived by the defendant.

The defendant claims that the court erroneously suggested to the jury that it was proper for the jury to find that the defendant had the specific intent for the commission of the crime but that the state had not disproven intoxication. The defendant isolates and focuses upon the portion of the instruction in which the court stated: "[I]f you have unanimously found that the defendant specifically intended to and caused the death [of the victim], but the state has not disproven intoxication beyond a reasonable doubt, then you will go on to consider manslaughter in the first degree." The defendant argues that the court "told the jury that intoxication was to be considered separate and apart from consideration of the element of specific intent . . . ."

The defendant did not object to the instruction underlying this claim. The record reflects that on January 30, 2008, the court conferred with the parties, on the record, concerning various aspects of its charge. On January 31, 2008, the court conferred with the parties, off the record, concerning the charge. At that time, the court distributed to the parties a working draft of its charge, including an instruction on intoxication. On February 1, 2008, the defendant submitted a written request to charge addressing several issues, including intoxication. The instruction delivered by the court did not mirror the defendant's requested instruction.[8]

[8] We note that the defendant does not assert that this requested instruction was sufficient to preserve this issue for review in accordance with Practice

On February 5, 2008, the court distributed to the parties copies of its "final charge."[9] The court summarized its recollection of the charge conferences that it had held with the parties. Afterward, the court stated: "I want to give you folks even more time if you need it to check this instruction to see if you find any errors in it." Thereafter, the court asked, "[d]oes anybody have any addition, summation, disagreements, additions, subtractions from my summary of the charge conference?" In response, one of the defendant's attorneys raised an issue related to the issue of diminished capacity. The court then asked if there was "[a]nything further" related to the charge. The defendant's attorney stated, "[n]o." Then, the court delivered its charge to the jury. Following the court's charge, one of the defendant's attorneys objected to an unrelated instruction. The court then asked if there were any other comments, to which the defendant's attorney replied, "No, Your Honor."

The defendant acknowledges that he did not object to the court's instruction and in his main brief affirmatively requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). It is well settled, however, that "when a right has been affirmatively waived at trial, we generally do not afford review under either *Golding* or the plain error doctrine [embodied in Practice Book § 60-5]." *Mozell* v. *Commissioner of Correction*, 291

Book § 42-16. Although the requested instruction addressed the issue of intoxication, the defendant states that he "did not submit a different request to charge on this precise matter . . . ." We need not analyze whether the instruction requested, viewed in isolation, was sufficient to preserve the issue for review because our resolution of this issue focuses upon the defendant's subsequent acquiescence in the court's charge.

[9] The record does not contain copies of the charges circulated by the court on either January 31, 2008, or February 5, 2008. In its brief, the state asserts that, as it pertains to the present claim, these charges encompassed the same instructions that the court ultimately delivered to the jury. The defendant does not dispute this relevant factual assertion, and there is nothing in the record to contradict it.

Conn. 62, 70, 967 A.2d 41 (2009). In its brief, the state asserts that the defense "induced" the court to deliver the instruction at issue because (1) the defense received a copy of the court's instructions well in advance of the charge, (2) the court implored the defense to review the charge for errors and (3) the defense did not object to the instruction on this ground at any time during the trial. The defendant urges this court to conclude that *Golding* review is appropriate because, at trial, he merely "acquiesce[ed] to the charge as given at trial" but did not actively induce the court to deliver the allegedly improper instruction.

The state's argument is, in substance, one grounded in the doctrine of implicit waiver. Recently, in *State* v. *Kitchens*, 299 Conn. 447, 475–83, 10 A.3d 942 (2011), our Supreme Court clarified the doctrine of implicit waiver with regard to claims of instructional error. As it pertains to the issue under review, the court reaffirmed that a claim of instructional error may be deemed waived "when the defense failed to take exception to, and acquiesced in, the jury instructions following one or more opportunities to review them." Id., 480. The court explained that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case." Id., 482–83.

Following our careful review of the record, we deem the defendant to have implicitly waived this claim. The

record reflects that the trial court provided copies of its charge for review and provided for a meaningful review of the charge, including the instruction at issue. On the record, the court solicited comments concerning the charge. The record reflects that, absent objections related to unrelated matters concerning the charge, defense counsel affirmatively accepted the instructions proposed and given. What the defendant describes as acquiescence in the charge given at trial constitutes an implicit waiver under the rationale set forth in *Kitchens.* Accordingly, we decline to review the claim under *Golding.*

## III

Next, the defendant claims that the evidence was insufficient to prove that he committed felony murder. We disagree.

"The standard of review [that] we [ordinarily] apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . .

because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 656–57, 1 A.3d 1051 (2010).

In an amended information, the state charged the defendant with felony murder in violation of § 53a-54c in that "on or about December 23-24, 2005, at [the victim's residence], the defendant, acting alone or with one or more persons did commit the crime of [b]urglary and in the course of and in furtherance of such crime, he caused the death of Jose Morales . . . by stabbing him with a knife." Section 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits . . . burglary . . . and, in the course of and in furtherance of such crime . . . he . . . causes the death of a person other than one of the participants . . . ." The state separately charged the defendant with the predicate felony for the felony murder charge, burglary in the

first degree in violation of § 53a-101 (a) (1), alleging that "on or about December 23-24, 2005, at [the victim's residence] the defendant, while armed with a dangerous instrument, to wit: a knife, remained unlawfully in said building with the intent to commit a crime therein." Section 53a-101 (a) provides in relevant part: "A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with . . . a . . . dangerous instrument . . . ." At trial, the state proceeded on the theory that the defendant had remained unlawfully in the victim's residence with the intent to commit the crimes of assault in the third degree or larceny in the sixth degree. The court instructed the jury with regard to the essential elements of both of these offenses.

During its felony murder instructions, the court referred to its earlier instructions concerning burglary in the first degree. As part of its instructions on the burglary count, the court instructed the jury to determine whether the defendant had remained unlawfully in a building. In this context, the court instructed the jury: "You must also determine whether the defendant lawfully remained in the building. A person unlawfully remains in a building when the building at that time is not open to the public and the defendant is not licensed or privileged to do so. 'To do so' refers back to remaining. To be licensed or privileged, the defendant must either have consent from the person in possession of the building or have some other right to be in the building.

"Now, a person may have entered a building lawfully, that is, he had the right or had been given permission, but that right is terminated or the permission withdrawn by someone who had a right to terminate or withdraw it, and it was withdrawn explicitly or implicitly. You may find the defendant unlawfully remained in the building under these circumstances; in other words, if permission or invitation have been withdrawn, as I have

defined that for you." The court instructed the jury that these instructions applied to its consideration of the felony murder count. The defendant did not challenge the correctness of these instructions at trial and does not do so in the present appeal.

There are two distinct aspects of the defendant's sufficiency claim. First, the defendant argues that there was no evidence that he killed the victim while he *remained unlawfully* in the victim's residence. Second, the defendant argues that there was no evidence that he killed the victim *in the course of and in furtherance of a burglary*. We will address each aspect of the claim in turn.

A

First, we address the defendant's argument that there was no evidence that the defendant killed the victim while the defendant *remained unlawfully* in the victim's residence. The defendant correctly states that the state's theory of the case, which was supported by the evidence and argued before the jury, was that the victim had consented to the defendant's entry to his residence on December 24, 2005, and the victim had consented to the defendant's staying overnight. The defendant stabbed the victim, thereby causing his death, after the victim had fallen asleep in his bedroom. During closing argument, the prosecutor argued that once the defendant intended to commit a crime in the victim's residence, the victim's consent for the defendant to remain in the residence had been "implicitly revoked."[10] The

_____

[10] In this regard, the prosecutor advanced the following argument to the jury: "[T]he state has to first prove the crime of burglary and then that, in the course of committing the crime of burglary, the defendant caused the death of [the victim]. So, essentially, burglary in this case is that the defendant unlawfully remained in a building with the intent to commit a crime therein.

"Now, you may say to yourself, but [the defendant] was invited in or at least the information that we have is that he was invited in by [the victim]. So, how could he be unlawfully remaining in the apartment? Simply put, ladies and gentlemen, to unlawfully remain in a building with the intent to commit a crime therein is, he loses his invitation to be within that building

prosecutor relied upon this theory of implicit revocation as a basis for demonstrating that the defendant's remaining in the apartment had become unlawful.[11]

The defendant argues that there was no evidence that the victim *explicitly* had revoked the defendant's

at the point that he forms an intent to commit a crime. You're no longer lawfully remaining in someone's home at that point.

"At the point that you, again, determine that you are going to commit a crime, you form an intent to commit a crime, your lawful invitation is implicitly revoked. Even if [the victim] was not able to explicitly revoke his invitation, implicitly that invitation is revoked.

"The state claims that . . . once the defendant then formed an intent to either assault [the victim] or to steal from him, that the defendant was then unlawfully in that home and, therefore, committing the crime of burglary. Based on the evidence that you have before you, the defendant clearly formed an intent to assault [the victim] because he then did. He also formed an intent to steal from [the victim] because, again, he did steal [the victim's] belongings."

[11] The defendant urges us to evaluate the sufficiency of the evidence solely in light of this theory of unlawful remaining. Thus, the defendant devotes his argument to discrediting the validity of the state's argument, advanced before the jury, that the defendant's intent to commit a crime in the apartment rendered his presence unlawful. See footnote 8 of this opinion. We decline to limit our evaluation of the evidence in this manner. Accordingly, we need not determine whether the state's argument was sound. The court instructed the jury that the arguments advanced by the prosecutor and defense counsel were not evidence. The court also instructed the jury that it had the exclusive function of explaining the applicable legal principles, stating in relevant part: "It is your obligation to accept the law as I state it." Although the state's theory of the case is not immaterial, we are mindful that the jury, in its role as fact finder, was not bound by the prosecutor's evaluation of the evidence and statements of law. The court instructed the jury to conduct its own independent evaluation of the evidence and to apply the law to its findings of fact. "The jury is presumed to follow the court's instructions absent a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Ali*, 233 Conn. 403, 424, 660 A.2d 337 (1995). There is no claim made here, nor was there a claim raised during trial, that the court incorrectly instructed the jury with regard to the unlawful remaining element of burglary. The issue before us is whether the evidence reasonably permitted a finding that such element of the crime had been proven beyond a reasonable doubt. In resolving that issue, we will not limit our consideration solely to theories of criminal liability advanced by the state during closing argument but to the evidence and legal principles that the jury was instructed to consider and apply.

license to be present in his residence. The defendant asserts that, if the state had demonstrated that the defendant actually had terrorized the victim, the jury properly could have inferred that the defendant's license or privilege to remain in the residence had been implicitly withdrawn and that his presence had become unlawful. The defendant, however, argues that the state could not demonstrate that the victim *implicitly* had revoked such license or privilege in the present case because the evidence did not support a finding that the victim was conscious of the defendant's criminal activity or that the defendant actually had terrorized the victim. Moreover, the defendant argues that the state relied upon a legally incorrect view of the evidence when it argued to the jury that the defendant's presence in the residence was unlawful once the defendant had intended to commit a crime therein. The defendant asserts that the burglary statute clearly delineates between the essential elements of intent and unlawful remaining and that the state's view, that unlawful remaining is proven merely by evidence of an accused's criminal intent, eviscerates the unlawful remaining requirement imposed by law.

General Statutes § 53a-100 (b), which applies to the offense of burglary in the first degree, provides in relevant part that "[a] person 'enters or remains unlawfully' in or upon premises when the premises, at the time of such entry or remaining, are not open to the public and when the actor is not otherwise licensed or privileged to do so." "A license in real property is defined as a personal, revocable, and unassignable privilege, conferred either by writing or parol, to do one or more acts on land without possessing any interest therein. . . . Generally, a license to enter premises is revocable at any time by the licensor. . . . It is exercisable only within the scope of the consent given. . . . The phrase 'licensed or privileged,' as used in . . . § 53a-100 (b)

is meant as a unitary phrase, rather than as a reference to two separate concepts." (Citations omitted; internal quotation marks omitted.) *State* v. *Allen,* 216 Conn. 367, 380, 579 A.2d 1066 (1990). "To enter unlawfully contemplates an entry which is accomplished unlawfully, while to remain unlawfully contemplates an initial legal entry which becomes unlawful at the time that the actor's right, privilege or license to remain is extinguished." *State* v. *Belton,* 190 Conn. 496, 500, 461 A.2d 973 (1983).

There was no evidence that the victim explicitly had revoked the defendant's license or privilege to remain in the residence. We must determine, therefore, whether the jury reasonably could have found that the victim implicitly had revoked such license or privilege or whether the defendant's presence was unlawful because it exceeded the scope of the license or privilege afforded the defendant.

It is widely recognized that "[t]he original and basic rationale of the crime [of burglary] is the protection against invasion of premises likely to terrorize occupants." (Internal quotation marks omitted.) *State* v. *Morocho,* 93 Conn. App. 205, 218, 888 A.2d 164, cert. denied, 277 Conn. 915, 895 A.2d 792 (2006). Thus, "even if one is lawfully admitted into a premises, the consent of the occupant may be implicitly withdrawn if the entrant terrorizes the occupants." *State* v. *Henry,* 90 Conn. App. 714, 726, 881 A.2d 442, cert. denied, 276 Conn. 914, 888 A.2d 86 (2005); see also *State* v. *Morocho,* supra, 218 (holding that jury reasonably could infer that defendant had remained unlawfully in victim's bedroom because he had caused victim to experience terror); *State* v. *Reyes,* 19 Conn. App. 179, 192, 562 A.2d 27 (1989) (holding that evidence sufficient to support finding that defendant had remained unlawfully because he engaged in "the kind of 'remaining' which is likely to terrorize

occupants"), cert. denied, 213 Conn. 812, 568 A.2d 796 (1990).

Here, there was ample evidence that the defendant, having entered the victim's residence lawfully, had engaged in the type of conduct likely to cause terror to an occupant. There was evidence that the defendant had entered the victim's bedroom while the victim lay asleep, placed an article of clothing over the victim's upper body and, using a large knife, stabbed the victim about his torso. Certainly, this activity is likely to cause terror to an occupant of the premises. Additionally, the evidence permitted the jury to infer that the victim had experienced terror as a result of the defendant's conduct, at night, in the victim's bedroom. The defendant placed an article of clothing over the victim's upper body before stabbing the victim multiple times about his torso. At trial, Susan Williams, an associate medical examiner, testified concerning the manner of the victim's death. Williams performed an autopsy on the victim and examined the multiple stab wounds on his torso. Williams did not testify that any of the stab wounds immediately had caused the victim's death but that the victim had bled to death. In light of the evidence concerning the manner that the defendant caused the victim's death, the jury reasonably could have found that the victim had perceived terror, even if for a brief period of time.

Moreover, as discussed previously, the jury could consider the scope of the license or privilege that the victim granted the defendant and, specifically, whether the defendant's remaining in the premises became unlawful because he had exceeded the scope of the victim's consent to remain in the premises. See *State v. Allen,* supra, 216 Conn. 380 (noting that entrant's license properly exercised within scope of consent given by occupant of premises). Here, it was entirely

reasonable for the jury to find that the victim had consented to the defendant's staying the night in his residence but did not consent to the defendant's criminal conduct in his residence, including his entering his bedroom and stabbing the victim to death with a knife. See *State* v. *Gelormino*, 24 Conn. App. 563, 571–72, 590 A.2d 480 (even if victim had consented to defendant's entry, defendant's remaining was unlawful because "vicious assault perpetrated on the victim was clearly not within the scope of that consent"), cert. denied, 219 Conn. 911, 593 A.2d 136 (1991). For all of the foregoing reasons, we conclude that the jury reasonably could have found that the defendant unlawfully remained in the victim's residence.

## B

Next, we address the argument that there was no evidence that the defendant killed the victim *in the course of and in furtherance of a burglary*. The defendant argues that although the evidence clearly established that he killed the victim and deprived the victim of certain property following his death, there was no evidence to demonstrate that the killing occurred while he possessed a larcenous intent. Stated otherwise, the defendant argues that the state did not establish a temporal nexus between his intent to commit larceny and his killing of the victim.

In arguing this claim before this court, the defendant focuses solely upon larceny as the crime underlying the burglary count.[12] The court, however, instructed the jury to consider, in the context of the burglary count, whether the defendant had remained unlawfully in the

---

[12] In his brief, the defendant explicitly declined to address whether, for the purpose of the felony murder count, the evidence was sufficient to demonstrate that he intended to commit assault because, he argues, the court did not properly permit the jury to consider whether he intended to commit assault for purposes of the felony murder count. We address and reject this claim in part IV of this opinion.

victim's residence with the intent to commit the crime of assault in the third degree or with the intent to commit the crime of larceny in the sixth degree. The jury delivered a general verdict; the record does not reveal whether the jury based its verdict upon a finding that the defendant killed the victim while intending to commit an assault or while intending to commit larceny, as charged. Under these circumstances, it is unnecessary to determine whether the evidence supported the conviction solely on the basis that the defendant committed burglary with a larcenous intent because in accordance with the court's instructions the jury could have concluded that the evidence was sufficient to find the defendant guilty of committing burglary with an assaultive intent.

"[A] factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation. . . . It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance— remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." (Citations omitted; internal quotation marks omitted.) *State* v. *Cummings*, 91 Conn. App. 735, 750, 883 A.2d 803, cert. denied, 276 Conn. 923, 888 A.2d 90 (2005); see also *State* v. *Roth*, 104 Conn. App. 248, 258, 932 A.2d 1071 (2007); *State* v. *Anderson*, 86 Conn. App. 854, 862–64, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). The defendant does not claim that the evidence did not demonstrate that he killed the victim in the course of and in furtherance of a burglary during which he intended to commit the crime of assault in the third degree. We must presume that this unchallenged evidentiary basis amply

supported the verdict. Accordingly, we need not resolve the claim presented because the defendant has not demonstrated that our resolution of the claim is necessary to affirm the judgment.

## IV

Finally, the defendant claims that the court improperly expanded the offense of felony murder. We conclude that the defendant waived this claim of error.

On March 27, 2006, the court, *Sheldon, J.*, held a probable cause hearing during which time the state requested a finding of probable cause for the crimes of murder and felony murder. At the conclusion of the hearing, the prosecutor argued that there was probable cause to find that the defendant had killed the victim in the course of or furtherance of committing a burglary. Concerning the burglary, the prosecutor argued that the defendant had remained unlawfully in the victim's residence while intending to commit an assault therein. The court expressed its belief that, as a matter of law, it was improper for the burglary underlying the felony murder count to be based upon an intent to commit an assault. The court stated: "I think you've got arguably a case inferentially for robbery and inferentially a case for burglary. But when burglary is based upon intent to commit assault, then it's a bootstrapping to make that into a murder . . . . That's not the basis on which I would be inclined . . . to consider your showing of probable cause on the felony murder count. I think that you've got certainly an argument to make on robbery by way of inference by reason of the fact that so much was taken, and, thus, there's an intent to steal or commit larceny upon entering or remaining unlawfully; then, that would support burglary and, in turn, would support felony murder." The prosecutor cited case law and argued to the contrary.

Later, the court stated: "With respect to felony murder, the court finds that there is probable cause to believe that [the defendant] committed murder on the theory of felony murder, in that he committed a burglary by entering with the intent to commit a crime of larceny by theft of items personally belonging to [the victim]. . . . I believe that there is in fact enough evidence to warrant a finding of probable cause, that there was an intent to steal and, thus, an adequate intent to commit the crime of burglary. And when one causes the death of another in the course of and in furtherance of the commission of the crime of burglary, then that constituted felony murder. On that basis, the state may proceed.

"With respect to the issue of intent, that was the threshold intent to cause it to be an illegal intent [for the crime of burglary], again, I believe that that intent could have been formulated at the time of the remaining unlawfully . . . and I would point out that at the time of the original entering, there appears to have been a lawful entry in the sense he was permitted, albeit by an individual who had no idea what was coming to him. It was only afterward, after the killing . . . occurred or contemporaneous with it that there could have been the intent formed to do something other than that by way of the assault. So, the illegal entry, if you will, would not have been contemporaneous with the killing act had it been a mere intent to commit the crime of burglary because it wouldn't have been an illegal entry at that point; it's only illegal afterward. But I believe it was illegal afterward when he remained in the apartment and that he did in fact steal and that in fact this was part of an original plan to steal. Therefore, on that basis, defining burglary with intent to commit larceny is the basis on which the state may go forward."

As stated previously in this opinion, the state charged the defendant with having committed felony murder

by causing the victim's death in the course of and in furtherance of the crime of burglary. Just prior to closing arguments, the court, *Mullarkey, J.*, discussed the content of its charge. The court referred to the fact that it had held charge conferences with counsel that were not on the record. The court referred to several topics that it had discussed with counsel during those conferences, stating in relevant part: "I asked the state particularly . . . what crimes it claimed were the underlying crimes of burglary, which is an issue in both the burglary [in the first degree] count and the felony murder count. . . . [The] state indicated at that time that [it was] requesting larceny sixth and assault third as the specific crimes intended by the defendant for [the] claim underlying the concept of burglary." Thereafter, the court noted that it had given counsel copies of its jury charge, noting that it wanted counsel to have as much time as necessary to review the charge thoroughly.[13] After referring to these various matters discussed at the charge conference, the court asked, "[d]oes anybody have any . . . summation, disagreements, additions, subtractions from my summary of the charge conference?" At that time, the defendant's attorney objected to the court's refusal to deliver an instruction regarding diminished capacity but did not raise any other concerns or objections to the matters specifically discussed by the court, including the state's requested instruction. After a recess, the court asked counsel if they were ready to proceed and, following an affirmative reply by defense counsel, it proceeded to closing arguments.

[13] It does not appear that the draft jury charge was marked as a court exhibit, and such charge does not appear in the record. In its brief, the state represents that, consistent with the court's final charge, the draft jury charge provided to counsel contained instructions that the burglary count was premised upon an intent to commit either larceny in the sixth degree or assault in the third degree. The defendant does not dispute this representation either in his main brief or in his reply brief, and there is nothing in the record to suggest that these instructions, which directly are relevant to the present claim, did not appear in the draft jury charge provided to counsel.

As stated previously, during closing argument, the prosecutor argued to the jury that, for purposes of the felony murder count, the defendant could be found to have committed burglary if he unlawfully remained in the victim's residence while intending to assault the victim or intending to steal from the victim. Although the state clearly referred to the mental state for the crimes of assault in the third degree and larceny in the sixth degree, the crimes referred to by the court in discussing the content of its charging conferences, the defendant did not object to this argument at any time.

Later, the court instructed the jury that, for purposes of the felony murder count, the defendant could be found to have committed burglary if he unlawfully remained in the victim's residence intending to commit either assault in the third degree or larceny in the sixth degree. At no time did the defendant object to the court's instruction.

For the first time, on appeal, the defendant claims that the court impermissibly expanded the scope of felony murder beyond what was authorized at the probable cause hearing.[14] The defendant seeks review of the unpreserved claim under *State* v. *Golding,* supra, 213 Conn. 239–40, or the plain error doctrine.

"Article first, § 8, of the Connecticut Constitution, as amended, provides in part that [n]o person shall be held to answer for any crime, punishable by death or life

[14] Embedded in the defendant's argument is his assertion that the court violated his right "not to be convicted of an offense that has not been charged" and his "right to be informed of the charges against him." We readily reject this assertion, as the defendant has not in any way demonstrated that he lacked notice of the charges against him, let alone attempted to demonstrate how any issues of notice prejudiced his defense. This claim of notice does not appear as a separately briefed claim, and it is not supported by adequate analysis. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Anderson,* 67 Conn. App. 436, 441–42 n.8, 787 A.2d 601 (2001).

imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law. . . . In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. . . . The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992).

"In *State* v. *Mitchell*, 200 Conn. 323, 332, 512 A.2d 140 (1986), we recognized that an adversarial probable cause hearing is a critical stage in the prosecution of a defendant and held that under the express terms of article first, § 8, of our state constitution as amended, [a valid probable cause hearing] is a jurisdictional prerequisite to continuing prosecution." (Internal quotation marks omitted.) *State* v. *Niblack*, 220 Conn. 270, 275–76, 596 A.2d 407 (1991). Later, our Supreme Court clarified that the trial court's "subsequent jurisdiction to hear the trial pertains, not to subject matter jurisdiction, but only to jurisdiction over the person of the defendant. . . . Accordingly, like other defects relating to jurisdiction of the person, any infirmity in the evidence presented at a probable cause hearing is deemed to be waived if not seasonably raised." (Internal quotation marks omitted.) *State* v. *John*, 210 Conn. 652, 665 n.8, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

Here, the defendant had the benefit of a probable cause hearing, and he does not take issue with the

hearing or the result thereof. Effectively, the defendant asserts that his conviction of felony murder is moot because the court permitted the jury to find him guilty of that crime on a theory of criminal liability (involving assault) that was denied the state at the probable cause hearing. As the defendant correctly observes, the court, *Sheldon, J.*, concluded that probable cause did not exist to prosecute the defendant under such theory, but the court during trial, *Mullarkey, J.*, instructed the jury that it could find the defendant guilty of felony murder if he unlawfully remained in the victim's residence while intending to commit assault.

The state argues that the defendant cannot prevail because the defendant "waived the defect he now alleges by not seasonably raising it at trial." The state relies upon the fact that, in the context of discussing its proposed charge, the court specifically raised the matter with counsel, and the defendant did not object to the state's request that the court instruct with regard to assault in the third degree and larceny in the sixth degree. Likewise, the state relies upon the defendant's lack of objection to the state's argument and the court's jury instruction concerning both of those crimes as the underlying crimes for burglary.

"The most basic rights of criminal defendants are . . . subject to waiver." (Internal quotation marks omitted.) *State* v. *Chimenti*, 115 Conn. App. 207, 231, 972 A.2d 293, cert. denied, 293 Conn. 909, 978 A.2d 1111 (2009). A probable cause hearing may be waived; General Statutes § 54-46a (a); and, as reflected in the authorities cited previously, defects related to personal jurisdiction also may be waived. See also *State* v. *Anthony*, 24 Conn. App. 195, 203, 588 A.2d 214 ("[p]ersonal jurisdiction may be acquired either by consent of the accused or by waiver unless an objection is properly preserved"), cert. dismissed, 218 Conn. 911, 591 A.2d 813, cert. denied, 502 U.S. 913, 112 S. Ct. 312, 116 L.

Ed. 2d 254 (1991); *State* v. *Baez*, 194 Conn. 612, 616, 484 A.2d 236 (1984) (same). "Waiver consists of the intentional abandonment or voluntary relinquishment of a known right. . . . [It] involves the idea of assent, and assent is an act of understanding. . . . [W]aiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) *State* v. *Jefferson*, 114 Conn. App. 566, 572, 970 A.2d 797, cert. denied, 292 Conn. 921, 974 A.2d 722 (2009).

Generally, "[w]hen a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal." *State* v. *Smith*, 289 Conn. 598, 621, 960 A.2d 993 (2008). "[A] valid waiver calls into question the existence of a constitutional violation depriving the defendant of a fair trial for the purpose of *Golding* review [and it] also thwarts plain error review of a claim." (Internal quotation marks omitted.) *State* v. *Wells*, 111 Conn. App. 84, 88–89, 957 A.2d 557, cert. denied, 289 Conn. 958, 961 A.2d 423 (2008).

Having considered all of the relevant circumstances, we conclude that the defendant assented to the jury considering the theory of criminal liability that he challenges on appeal. We recognize that the circumstances of the present case are unique and that, in accordance with the ruling at the probable cause hearing, the state should not have asked the court to instruct the jury with regard to assault as the underlying crime for burglary and should not have pursued such theory of criminal liability in its argument to the jury. Nevertheless, the state's error is not dispositive of the issue before us. There is no indication in the record that Judge Mullarkey, who presided over the trial, was aware of Judge Sheldon's ruling at the probable cause hearing. We are presented with a situation in which the defendant's

attorney, Michael J. Isko, represented the defendant
and was present in court at the probable cause hearing
on March 27, 2006, before Judge Sheldon. Isko repre-
sented the defendant and was present in court on Febru-
ary 5, 2008, when Judge Mullarkey discussed the charge
conferences he had conducted with counsel, when the
state presented its closing argument to the jury and
when Judge Mullarkey delivered his charge. Despite
having notice of the court's ruling at the probable cause
hearing, the defendant's attorney did not apprise Judge
Mullarkey of the ruling at the probable cause hearing,
object to the draft jury charge, object to the state's
argument or object to the instructions that were deliv-
ered to the jury. The defendant's counsel, acting on
the defendant's behalf at trial, had the immediate and
ultimate responsibility to object to matters submitted
to the court that he deemed improper. See *State* v.
*Stewart*, 64 Conn. App. 340, 352, 780 A.2d 209, cert.
denied, 258 Conn. 909, 782 A.2d 1250 (2001). Moreover,
having identified the state's theory of the case and
invited counsel to comment on it, the court was entitled
to rely upon the representation of counsel—that there
was no objection. This is not a situation involving a
mere failure to object; under these circumstances, we
conclude that the defendant's conduct represented his
assent to the theory of criminal liability relied upon
by the state.[15] Accordingly, the defendant's resort to
*Golding* review or the plain error doctrine is unavailing.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[15] We emphasize that, although the court's instructions are integral to our
waiver analysis, this is not a claim of instructional error.